Edith Kritzer Paulman, Plaintiff-Appellee, v. Henry E. Kritzer, Kritzer Radiant Coils, Inc., a Delaware Corporation, Batavia-Kritzer, Inc., a Delaware Corporation, Courtland G. Newton and Manfred A. Lucchese, Defendants-Appellants.

Gen. No. 65–121.

Second District.

September 1, 1966.

George B. Christensen and R. Lawrence Storms, of Chicago (Winston, Strawn, Smith & Patterson, of counsel), for appellants.

Harold J. Keele and Halbert O. Crews, of Chicago, for appellee.

MR. JUSTICE DAVIS delivered the opinion of the court.

This suit was instituted by the plaintiff and her sister as a stockholders' derivative suit for the benefit of the defendant, Kritzer Radiant Coils, Inc., a Delaware Corporation, herein called KRC. The plaintiff contends that her brother, the defendant Henry E. Kritzer, Sr., herein called Kritzer, violated the fiduciary duty owed by him to KRC as an officer and director in seizing certain corporate opportunities for his own benefit. The plaintiff's sister withdrew from the case before testimony was heard before the Special Master.

Since 1954 Kritzer has been president and a member of the Board of Directors of KRC and has owned 50% of its outstanding stock, and the plaintiff and her sister have each owned 25%. At the stockholders' meeting on February 20, 1956, a deadlock developed in the election of directors when Kritzer refused to vote to elect a representative of the plaintiff. Since that time no further meetings of the shareholders were called or held and the same directors have continued in office. Since such deadlock, the personal relations of the shareholders have deteriorated and they have sought recourse through litigation.

The corporation was engaged in the business of manufacturing and selling heating equipment. Its quarters in 1954, located at 2901 Lawrence Avenue, Chicago, were inadequate for various reasons and it was searching for a more suitable location. In October of 1954, Kritzer, individually, purchased on contract for the sum of $126,400 certain unimproved real estate known as the Ebertt tract, for the purpose of solving KRC's housing and location problem. The down payment and the installment contract

payments in the sum of $82,950—being all of the payments due on said contract to the date of the sale of the tract by Kritzer—were made from KRC funds. In August of 1957, Kritzer sold this property for a gross profit of $140,515.25, which he personally retained.

In October of 1955, Kritzer, individually, also purchased on contract for $45,000 a smaller parcel of land which adjoined the Ebertt tract, for the same purpose. This real estate is referred to as the Bulaw tract. The down payment and the first two semiannual installment contract payments were made by Kritzer from KRC funds. The funds invested in such real estate were carried on the KRC books as "Advances to Officers." Shortly after his sale of the Ebertt tract, Kritzer repaid to KRC $82,950, as well as an additional $7,403.22 which apparently was interest on such sum, although no explanation was given as to what the rate was or how it was determined. No part of the profit made by Kritzer on the sale of the Ebertt tract was turned over to KRC, and he still retains title to the Bulaw tract.

Early in 1956, Union Asbestos and Rubber Company, hereinafter called UNARCO, contracted KRC for the purpose of selling its heating division to KRC. An investigation of this proposal was made by KRC, and it was concluded that the equipment of the heating division would supplement that already owned by KRC and that its products would complement those of KRC. The officers of KRC decided that it would be advantageous to purchase this division of UNARCO. Subsequently, Kritzer organized Batavia-Kritzer, Inc., herein called B-K, a Delaware Corporation, with a capitalization of $1,000. He held all of its capital stock and was its president and one of its three directors. Courtland G. Newton—also a director of KRC—was one of the directors, as was Kritzer's son, Henry E. Kritzer, Jr. Kritzer then personally purchased substantially all of the assets of the heating division of UNARCO, including its inventory of raw materi-

als, machinery, equipment, tools, dies and jigs. As a part of this transaction, UNARCO assigned to Kritzer its rights as the lessee of certain premises used by its heating division, for manufacturing purposes. Kritzer then reassigned those interests to B-K, remaining personally liable on all of B-K's obligations to UNARCO. Over the next five to six years, KRC paid all or substantially all of B-K's purchase price for these assets to B-K as rental for the equipment and machinery, and also paid to B-K rental for the use of the manufacturing facilities located on the leased premises. KRC never acquired title to any of this property, which, at the end of this period, had considerable value.

The Master recommended that Kritzer be held to account to KRC for his net profits on the purchase and sale of the Ebertt tract; that he convey to the corporation the Bulaw tract—the title thereto still being vested in him; and that he convey all of his stock in B-K to KRC, all subject to credit for his payments on the realty still owned, his contributions to the capital of B-K, and to indemnification for personal liability on the purchase of UNARCO's assets. The trial court approved and adopted the findings and orders of the Master.

■ ■ KRC is a Delaware Corporation, and Delaware law, with respect to the fiduciary duties of a corporation's officers and directors, is controlling. National Lock Co. v. Hogland, 101 F2d 576, 579 (CA 7th, 1939). It is almost universally recognized that the directors and officers of a corporation occupy a fiduciary relation toward it. Shlensky v. South Parkway Bldg. Corp., 19 Ill2d 268, 278, 166 NE2d 793 (1960). This standard is succinctly set forth in Loft, Inc. v. Guth, 23 Del Ch 138, 2 A2d 225 (1938) at pages 238 and 239 in the following language:

> "Such are the fiduciary duties and obligations of an officer and director of a corporation that if a business opportunity comes to him which is in the line of his corporation's activities and of advantage to it

289

and especially if really intended for it, the law will not allow him to divert the opportunity from the corporation and embrace it as his own. If he does so, the corporation has a right to claim the benefits of the opportunity for itself and to impress the property which the director and officers received together with all profits thereon with a trust in its favor."

In the case at bar it is conceded that KRC was in need of and searching for a new location. The real estate purchased by Kritzer—both the Ebertt tract and the adjoining Bulaw tract—was intended for the use of KRC. The availability of the real estate came to the knowledge of Kritzer while searching for property for KRC. The funds of KRC financed the purchase of the Ebertt tract and were used to make the down payment and all semiannual payments thereon—in the sum of $82,958—up to the time when Kritzer sold the property. KRC funds were also used to pay a considerable portion of the purchase price of the Bulaw tract; namely, the down payment and additional contract payments in the sum of $22,000. These factors clearly bring the transactions within the corporate opportunity doctrine.

As to UNARCO, it is conceded that it approached an officer of KRC, suggesting that KRC acquire its heating division; and that the acquisition would be advantageous to KRC. Again, the evidence indicates that KRC ultimately paid for the purchase of the UNARCO division. In the spring of 1956, Kritzer entered into a contract to purchase the assets of UNARCO heating division including a leasehold interest in a manufacturing plant in Batavia, on a time basis, the total ultimate obligation being in excess of $550,000. These assets were transferred from UNARCO directly to B-K, which then commenced operations at the Batavia plant.

KRC advanced $45,000 to B-K to enable it to commence operations and B-K then began to manufacture certain items previously manufactured by KRC. KRC also manu-

factured and sold to B-K, at 85% of the regular sale price, certain other items, thereby enabling B-K to resell at a profit. KRC further advanced other funds to B-K with the result that by December 31, 1956, B-K owed approximately $190,000 to KRC. By June 30, 1957, B-K had accounts payable to KRC totalling $352,000, and accounts receivable from KRC in the sum of $88,600.

In December of 1956, KRC bought all of B-K's inventory and work in progress valued at $415,000. B-K retained title to the machinery, tools and dies, as well as the leasehold interest. From January 1, 1957 to November 1, 1963, KRC paid B-K, $381,600 rental for B-K's equipment and machinery. The total purchase price paid by B-K to UNARCO for these items was $298,750. During the same period of time, KRC paid to B-K, $392,400 rental for the UNARCO premises and B-K paid UNARCO $331,200 for the same premises under lease to it. These circumstances likewise clearly bring these transactions within the corporate opportunity doctrine.

■ This doctrine is but one of the manifestations of the general equitable rule which demands of an officer or director of a corporation the utmost good faith and loyalty in his relations to the principal which he represents, and requires an undivided and unselfish loyalty to the corporate principal without conflict between this duty and the self-interest anticipated of human nature. The rule, described as inveterate and uncompromising in its rigidity, rests upon the broad foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation. Guth v. Loft, Inc., 23 Del Ch 255, 5 A2d 503, 510, 511 (1939); Pelcak v. Bartos, 328 Ill App 435, 66 NE2d 465 (1st Dist 1946); 3 Fletcher Cyc Corp, § 861 (1965 Ed).

In Henry's Drive-In, Inc. v. Anderson, 37 Ill App2d 113, 185 NE2d 103 (1st Dist 1962), the court, at page 123,

in quoting from Guth v. Loft, Inc., 23 Del Ch 255, 5 A2d 503, 511, set forth the scope of corporate opportunity and the remedies imposed by law:

". . . if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if, in such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired . . . . (Citing cases.)"

Kritzer seeks to avoid the trust impressed in favor of the corporation by asserting that he acted in good faith in undertaking these transactions and that KRC was not financially able to make the acquisitions without sacrificing its valuable banking connection.

As to the question of good faith, it was incumbent upon Kritzer to show it. It was not plaintiff's burden to show an absence of good faith. He must show that his every act in dealing with the opportunities presented was in the exercise of the utmost good faith. Henry's Drive-In, Inc. v. Anderson, supra, 123. We believe that the facts recited herein sufficiently show the absence of the utmost good faith and responsibility required of Kritzer in his fiduciary capacity.

As to the financial inability of KRC to assume these obligations, the facts again belie the contention. They show that KRC was, in fact, able to assume the financial

obligations in that it was solvent and financially sound and ultimately supplied the funds used in both the real estate and UNARCO transactions. Although the obligations were assumed by Kritzer individually, and title to the various assets taken in his name—either individually or through his wholly-owned corporation, B-K—the monies used to finance the ventures came, in one form or another, from KRC.

█ █ Kritzer contends that the UNARCO acquisition took the form it did because it could only be made on his personal obligation. The evidence does not support this assertion. Kritzer further claims that KRC would have lost its "very valuable banking connection" had it not undertaken these various transactions in the manner it did. However, we do not believe that the evidence warrants this conclusion. At the time of the real estate transactions, KRC did not owe this banking connection one penny. Nor do we believe that this banking connection, or any other worthy of the trust vested in it by KRC, would look with favor upon setting up these transactions in such manner that KRC would pay for the various assets and yet not reap the benefits or profits therefrom.

The inherent dangers of permitting a corporate officer or director to seize upon an opportunity on the grounds that the corporation is financially unable to do so, at a time when the corporation is solvent, is recognized in Irving Trust Co. v. Deutsch, 73 F2d 121 (CA 2nd, 1934) where the court, at page 124 stated:

> "If directors are permitted to justify their conduct on such a theory, there will be a temptation to refrain from exerting their strongest efforts on behalf of the corporation since, if it does not meet the obligations, an opportunity of profit will be open to them personally."

The philosophy underlying this concept was stated classically by Judge Cardozo, in these words:

"A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncomprising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions." Meinhard v. Salmon, 249 NY 458, 464, 164 NE 545, 546 (CANY 1928).

██ ██ Where a business opportunity is presented to an officer in his individual capacity, rather than in his official capacity as an officer or director, and the opportunity is one not essential to the corporation nor in which the corporation has any interest or expectancy, the opportunity is that of the officer and not of the corporation. Loft, Inc. v. Guth, 23 Del Ch 138, 2 A2d 225, 239 (1938). The test of whether a particular opportunity is an individual or corporate one "seems to be whether there was a specific duty, on the part of the officer sought to be held liable, to act or contract in regard to the particular matter as the representative of the corporation—all of which is largely a question of fact." 3 Fletcher Cyc Corp, § 862 (1965 Ed).

 Whether a corporate officer has seized a corporate opportunity for his own depends not on any single factor nor is it determined by any fixed standard. Numerous factors are to be weighed, including the manner in which the offer was communicated to the officer; the good faith of the officer; the use of corporate assets to acquire the opportunity; the financial ability of the corporation to acquire the opportunity; the degree of disclosure made to the corporation; the action taken by the corporation with reference thereto; and the need or interest of the corporation in the opportunity. These, as well as numerous other factors, are weighed in a given

294

case. The presence or absence of any single factor is not determinative of the issue of corporate opportunity.

 This question is determined by a consideration of all of the factors in light of the public policy upon which the duties of a fiduciary are based. In Farwell v. Pyle-National Elec. Headlight Co., 289 Ill 157, 124 NE 449 (1919), the court, on page 165, quoted from Michoud v. Gerod, 4 How 503, 555, 11 L Ed 1071, as follows:

> "The general rule stands upon our great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity. . . . In this conflict of interest the law wisely interposes. It acts, not on the possibility that in some cases the sense of that duty may prevail over the motives of self-interest, but it provides against the probability in many cases, and the danger in all cases, that the dictates of self-interest will exercise a predominant influence and supersede that of duty."

The only safe assumption in such a case is that self-interest rather than a sense of duty will be the motivation for the ensuing action. Loft, Inc. v. Guth, 23 Del Ch 138, 2 A2d 225, 239 (1938).

 The basis of the corporate opportunity doctrine rests fundamentally on the unfairness, in particular circumstances, of an officer or director, whose relation to the corporation is fiduciary, taking advantage of an opportunity for his own personal profit when the interest of the corporation justly calls for protection. The resolution of such question calls for the application of ethical standards of what is fair and equitable in a given situation. Durfee v. Durfee & Canning, Inc. (Mass), 80 NE2d 522, 529 (1948).

We find it difficult to accept the contention that Kritzer may claim the right to the $140,515.25 profit received on the sale of the Ebertt tract some three years

after it was purchased at a price of $126,400 for KRC and with KRC funds. The same rationale applies to the Bulaw tract which was purchased for KRC and, to a large extent, with KRC funds. Under the circumstances of this case, we likewise cast an incredulous look upon the suggestion that Kritzer is entitled to any of the benefits or profits which have inured to B-K through its purchase of the UNARCO division.

UNARCO initially sought to sell its heating division to KRC; such division was in the line of KRC's business and constituted a practical advantage to it; the business was closely associated with and suited to the existing business activities of KRC; KRC had fundamental knowledge of the business which UNARCO desired to sell, had practical experience therein and the ability to pursue and develop it; and there is no evidence that UNARCO would have refused to sell to KRC.

The contention that KRC was not financially able to seize this opportunity is not particularly compelling in view of its solvency and financial stability at the time, the terms of the purchase agreement, and the manipulated financial transactions which took place between KRC and B-K. The evidence does not indicate that KRC was unwilling or unable for any business reason, no matter how specious, to enter into the transaction with UNARCO. The executive and management force of B-K was largely that of KRC; and Kritzer, the president, director and controlling officer of KRC, was the sole shareholder of B-K and compelled KRC to enter into the unprofitable lease-rental arrangements with B-K, which inured to the profit of B-K and the deteriment of KRC. The record further indicates that it was KRC, which in all essential respects, supplied the management, resources and opportunities which made B-K grow and prosper.

██ ██ It cannot be denied that Kritzer occupied a fiduciary position and owed an obligation to KRC to de-

velop corporate opportunities for it and on its behalf, and to refrain from doing anything which might work injury to KRC or deprive it of profit or advantage which his skill, knowledge and ability might personally bring to it or enable it to realize in the reasonable exercise of its capacities and powers.

The decree of the trial court is, accordingly, affirmed.

Decree affirmed.

MORAN, P. J. and ABRAHAMSON, J., concur.